IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION ) <br> OF THE UNITED STATES OF AMERICA ) <br> FOR A SEARCH WARRANT FOR SNAPCHAT ) <br> USERNAME: SUBTAMER69 ) <br> THAT IS STORED AT A PREMISES ) <br> CONTROLLED BY SNAP INC. ) | Case No. <br><br> Magistrate Judge |

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Michael A. Harey, a Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, hereby depose and state:

### I.   EDUCATION TRAINING AND EXPERIENCE

1. I am a Special Agent with the FBI assigned to the Cincinnati Division and I have been a Special Agent since October 2008, having worked on counterterrorism investigations and public corruption investigations as a Special Agent. I am currently assigned to the FBI Child Exploitation Task Force, investigating matters involving the online exploitation of children and child pornography. I have made arrests and have executed search warrants pertaining to these types of investigations.

2. Prior to becoming a Special Agent with the FBI, I served as a U.S. Border Patrol Agent for approximately five years and a Federal Air Marshall for approximately five years; having begun my federal law enforcement career in February 1998. While performing my duties as a Special Agent, I have participated in various investigations involving computer-related offenses and have executed numerous search warrants, including those involving searches and seizures of computers, digital media, software, and electronically stored information. I have received both formal and informal training in the detection and investigation of computer-related offenses. As part of my duties as a Special Agent, I investigate criminal child exploitation and child pornography violations, including the illegal production, distribution, transmission, receipt, and possession of child pornography, in violation of 18 U.S.C. §§ 2251, 2252, and 2252A.

3. As a Special Agent, I am authorized to investigate violations of the laws of the United States and to execute warrants issued under the authority of the United States.

## II. PURPOSE OF THE AFFIDAVIT

4. I make this affidavit in support of an application for a search warrant for information associated with a certain Snapchat user ID that is stored at premises owned, maintained, controlled, or operated by Snap Inc. ("Snapchat"), a social networking company headquartered in Santa Monica, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Snapchat to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the Snapchat Username: SUBTAMER69 (the SUBJECT ACCOUNT).

5. The facts set forth below are based upon my own personal observations, investigative reports, and information provided to me by other law enforcement agents. I have not included in this affidavit all information known by me relating to the investigation. I have set forth only the facts necessary to establish probable cause for a search warrant for the content of the SUBJECT ACCOUNT.

6. The SUBJECT ACCOUNT to be searched is more particularly described in Attachment A, for the items specified in Attachment B, which items constitute instrumentalities, fruits, and evidence of violations of 18 U.S.C. §§ 2251, 2252, 2252A and 2422(b) – the production, advertising/solicitation for/or, distribution, transmission, receipt, and/or possession of child pornography and the coercion or enticement of a minor(s). I am requesting authority to search the entire content of the SUBJECT ACCOUNT, wherein the items specified in Attachment B may be found, and to seize all items listed in Attachment B as instrumentalities, fruits, and evidence of crime.

## III. APPLICABLE STATUTES AND DEFINITIONS

7. Title 18 United States Code, Section 2251(a) makes it a federal crime for any person to employ, use, persuade, induce, entice, or coerce any minor to engage in, or have a minor assist any other person to engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, if such person knows or has reason to know that either the visual depiction will be transported or transmitted via a facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, or that the visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or

2

affecting interstate or foreign commerce, or if the visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce. Subsection (e) of this provision further prohibits conspiracies or attempts to engage in such acts.

8. Title 18 United States Code, Section 2251(d)(1)(A) makes it a federal crime for any person to make, print, publish, or cause to be made, printed or published, any notice or advertisement that seeks or offers to receive, exchange, buy, produce, display, distribute or reproduce, any visual depiction involving the use of a minor engaging in sexually explicit conduct, if such person knows or has reason to know that either the notice or advertisement will be transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including by computer or mail; or that the notice or advertisement actually was transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including by computer or mail.

9. Title 18, United States Code, Section 2252, makes it a federal crime for any person to knowingly transport, receive, distribute, possess or access with intent to view any visual depiction of a minor engaging in sexually explicit conduct, if such receipt, distribution or possession utilized a means or facility of interstate commerce, or if such visual depiction has been mailed, shipped or transported in or affecting interstate or foreign commerce. This section also prohibits reproduction for distribution of any visual depiction of a minor engaging in sexually explicit conduct, if such reproduction utilizes any means or facility of interstate or foreign commerce, or is in or affecting interstate commerce.

10. Title 18, United States Code, Section 2252A, makes it a federal crime for any person to knowingly transport, receive or distribute any child pornography using any means or facility of interstate commerce, or any child pornography that has been mailed, or any child pornography that has shipped or transported in or affecting interstate or foreign commerce by any means, including by computer. This section also makes it a federal crime to possess or access with intent to view any material that contains an image of child pornography that has been mailed, shipped or transported using any means or facility of interstate or foreign commerce, or in or affecting interstate commerce by any means, including by computer.

11. Title 18, United States Code, Section 2422(b), makes it a federal crime for any person to knowingly use a means of interstate commerce to persuade, induce, entice, or coerce or

3

attempt to persuade, induce, entice or coerce, any individual who has not attained the age of 18 years, to engage in any sexual activity for which any person may be charged with a crime.

12. As it used in 18 U.S.C. §§ 2251 and 2252, the term "sexually explicit conduct" is defined in 18 U.S.C. § 2256(2) (A) as: actual or simulated sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; bestiality; masturbation; sadistic or masochistic abuse; or lascivious exhibition of the genitals or pubic area of any person.

13. As it is used in 18 U.S.C. § 2252A(a)(2), the term "child pornography"[1] is defined in 18 U.S.C. § 2256(8) as: any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where: (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; (B) such visual depiction is a digital image, computer image, or computer generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct.

14. The term "sexually explicit conduct" has the same meaning in § 2252A as in § 2252, except that for the definition of child pornography contained in § 2256(8)(B), "sexually explicit conduct" also has the meaning contained in § 2256(2)(B): (a) graphic sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex, or lascivious simulated sexual intercourse where the genitals, breast, or pubic area of any person is exhibited; (b) graphic or lascivious simulated; (i) bestiality; (ii) masturbation; (iii) sadistic or masochistic abuse; or (c) graphic or simulated lascivious exhibition of the genitals or pubic area of any person.

15. The term "minor", as used herein, is defined pursuant to Title 18, U.S.C. § 2256(1) as "any person under the age of eighteen years."

16. The term "graphic," as used in the definition of sexually explicit conduct contained in 18 U.S.C. § 2256(2)(B), is defined pursuant to 18 U.S.C. § 2256(10) to mean "that a

---

[1] The term child pornography is used throughout this affidavit. All references to this term in this affidavit, and Attachments A and B hereto, include both visual depictions of minors engaged in sexually explicit conduct as referenced in 18 U.S.C. § 2252 and child pornography as defined in 18 U.S.C. § 2256(8).

4

viewer can observe any part of the genitals or pubic area of any depicted person or animal during any part of the time that the sexually explicit conduct is being depicted."

17. The term "visual depiction," as used herein, is defined pursuant to Title 18 U.S.C. § 2256(5) to "include undeveloped film and videotape, and data stored on computer disk or by electronic means which is capable of conversion into a visual image.

18. The term "computer"[2] is defined in Title 18 U.S.C. § 1030(e)(1) as an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

### III. BACKGROUND REGARDING THE INTERNET, MOBILE APPLICATIONS AND SNAPCHAT

19. I have had both training and experience in the investigation of computer-related crimes. Based on my training, experience and conversations with other officers, I know the following:

20. The Internet is a worldwide network of computer systems operated by governmental entities, corporations, and universities. With a computer connected to the Internet, an individual computer user can make electronic contact with millions of computers around the world. Many individual computer users and businesses obtain their access to the Internet through businesses known as Internet Service Providers ("ISPs"). ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers; remotely store electronic files on their customers' behalf; and may provide other services unique to each particular ISP. ISPs maintain records pertaining to the individuals or companies that have subscriber accounts with the ISP. Those records may include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information, account application information, Internet Protocol addresses and other information both in computer data format and in written record format.

---

[2] The term "computer" is used throughout this affidavit to refer not only to traditional laptop and desktop computers, but also to internet-capable devices such as cellular phones and tablets. Where the capabilities of these devices differ from that of a traditional computer, they are discussed separately and distinctly.

5

21. Computers and the internet have revolutionized the way in which child pornography is produced, distributed, and utilized. It has also revolutionized the way in which those who have a sexual interest in children interact with each other and with minors. Specifically, the development of computers and the internet have added to the methods used by child pornography collectors to interact with and sexually exploit children. Computers and the internet serve four functions in connection with child pornography and the sexual exploitation of minors. These are production, communication, distribution, and storage.

22. Internet-based communication structures are ideal for the child pornography collector or those seeking to sexually exploit children. Having both open as well as anonymous communication capability allows the user to locate others of similar inclination and still maintain their anonymity, or to hide their true identity when seeking out minors online. Once contact has been established, it is then possible to send messages and graphic images to other trusted child pornography collectors, or to convince a child to sex such images or meet for the purpose of sexual activity. Individuals seeking to engage in such activities can use standard Internet connections, such as those provided by businesses, universities, and government agencies, to communicate with each other and to distribute pornography. These communication links allow contacts around the world as easily as calling next door. Additionally, these communications can be quick, relatively secure, and as anonymous as desired.

23. Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Google, Inc., among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet.

24. As is the case with most digital technology, communications by way of computer or mobile devices can be saved or stored on the computer or mobile device used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or mobile device, or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places, such as temporary files or ISP client software, among others. In addition to electronic communications,

6

a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

25. A growing phenomenon related to smartphones and other mobile computing devices is the use of mobile applications. Mobile applications, also referred to as "apps," are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a game. Examples of such "apps" include LiveMe, KIK messenger service, Snapchat, Meet24, and Instagram. Links can also be sent via some of these apps, including Instagram, that when clicked on can bring the recipient to a folder or cloud storage account, such as Dropbox or Mega, which contains significant amounts of child pornography.

26. According to the Snap Law Enforcement Guide, "Snapchat is a mobile application made by Snap Inc. ("Snap") and available through the iPhone App Store and Google Play Store. The Snapchat app provides users a way to share moments with photos, videos, and chats."

27. Snaps are photos or videos taken using the Snapchat app's camera on an individual's mobile device, and may be shared directly with the user's friends, or in a Story (explained below) or Chat. Snap's servers are designed to automatically delete a Snap after it has been viewed by all intended recipients. Snap's servers are designed to automatically delete an unopened Snap sent directly to a recipient after 30 days and an unopened Snap in Group Chat after 24 hours.

28. A user can add Snaps to their "Story". A "Story" is a collection of Snaps displayed in chronological order. Users can manage their privacy settings so that their Story can be viewed by all Snapchat users, their friends, or a custom audience. A user can also submit their Snaps to the app's crowd-sourced service "Our Story", which enables their Snaps to be viewed by all Snapchat users in Search and Snap Map. Snap's servers are designed to automatically delete a Snap in a user's Story 24 hours after the user posts the Snap, but the user may delete part or all of the Story earlier. Submissions to "Our Story" may be saved for longer periods of time.

29. Memories is Snapchat's cloud-storage service. Users can save their sent or unsent Snaps, posted Stories, and photos and videos from their phone's photo gallery in Memories. Content saved in Memories is backed up by Snap and may remain in Memories until deleted by

7

the user. Users may encrypt their content in Memories (called "My Eyes Only"), in which case the content is not accessible to Snap and cannot be decrypted by Snap.

30. A user can type messages, send Snaps, audio notes, and video notes to friends within the Snapchat app using the Chat feature. Snap's servers are designed to automatically delete one-to-one chats once the recipient has opened the message and both the sender and recipient have left the chat screen, depending on the user's chat settings.

31. Snap's servers are designed to automatically delete unopened one-to-one chats after the passage of 30 days. Users can also chat in groups. Chats sent in groups are deleted after 24 hours whether they are opened or not. A user can save a message in Chat by pressing and holding the message. The user can unsave the message by pressing and holding it again. Once a message is deleted in this manner by the user, it is also deleted from Snap's servers. Users can also delete chats that they have sent to a recipient before the recipient has opened the chat or after the recipient has saved the chat.

32. If a user has device-level location services turned on and has opted into location services on Snapchat, Snap will collect location data at various points during the user's use of Snapchat, and retention periods for location data vary depending on the purpose of the collection. Users have some control over the deletion of their location data in the app settings.

## VI. INVESTIGATION AND PROBABLE CAUSE

33. In late February 2019, an FBI Confidential Human Source (CHS) provided information to an FBI agent that Instagram user "SuperSmashCandy" was attempting to groom a 12-year-old female in Texas via Instagram direct messages by using language that included strong sexual content. Since approximately May 2017 and on numerous occasions, this CHS has provided reliable information to law enforcement.[3]

34. To corroborate the information provided by the CHS, a member of the FBI issued subpoenas to obtain subscriber information and IP login activity from Instagram for user "SuperSmashCandy" for the time period spanning November 1, 2018, through February 22, 2019, and identified that IP address 174.96.197.83 was consistently being used to login to this particular Instagram account. The registration IP for the "SuperSmashCandy" Instagram account

---

[3] Due to certain unusual sensitivities regarding this CHS and the manner in which he has obtained information in this case and in the past, additional details specific to the CHS' access to the reported information are not included in this affidavit, as it would tend to identify the CHS and compromise the CHS's position.

8

was also identified as 174.96.197.83. The email address used to register for this account was provided as subtamer96@gmail.com.

35. Records obtained regarding the subscriber of the target IP address and information located in law enforcement databases linked the suspect Instagram account to Michael Thomas SUTHERIN at an address in Columbus, Ohio. In late April 2019, investigators went to SUTHERIN's listed Columbus, Ohio address where they encountered SUTHERIN, who voluntarily agreed to be interviewed. At the beginning of the interview, agents explained to SUTHERIN that they were trying to determine if he was engaged in illicit sexual activities with children, either in person or via social media platforms, including but not limited to the Instagram account "SuperSmashCandy." SUTHERIN thereafter admitted that he utilized an email address containing the phrase "Sub Tamer 69" and the "SuperSmashCandy" Instagram account. SUTHERIN admitted to possessing child pornography files on his cellular phone and laptop computer, and explained that he obtained such files through various methods. These methods included receiving child pornography via his aforementioned Instagram account, and through Mega-links, which are hyperlinks to cloud storage accounts that contain large files, sent to his Instagram account, which he would thereafter access and download the contents onto his phone and his laptop. These Mega-links contained folders with numerous images and videos containing child pornography. SUTHERIN initially estimated that he had at least a dozen gigabytes of child pornography on his phone and computer, but later claimed it was only a couple of hundred videos and images of child pornography. SUTHERIN further admitted he had chatted with minor girls online and during these chats he asked the girls to send him pictures or videos of themselves doing sexual acts. He admitted that he possessed at least one recording of these encounters on his cell phone or laptop. In a secondary follow-up interview a few days later, SUTEHRIN reiterated that he engaged in such chats with young girls on both Snapchat and Instragram, and admitted that there would probably be some videos of such minor girls engaged in sexual activities on his phone.

36. SUTHERIN consented to a law enforcement search of his cellular phone and laptop computer for any evidence of the crimes to which he admitted, and signed a consent to search form regarding such search. Upon initial physical review of SUTHERIN's Apple I-Phone 8, and while preparing the phone for a forensic extraction, agents observed the social media application KIK was present on the phone. Agents know KIK to be commonly used by child

9

predators to solicit child pornography from other child predators, as well as from young children. Upon ensuring the phone was in airplane mode and opening the KIK application, agents observed evidence of child pornography in one of the chat strings. A search warrant was thereafter obtained for the cellular phone and laptop computer.

37. On May 21, 2019, agents created a bit-for-bit image copy of SUTHERIN's laptop. Your affiant reviewed the extraction of SUTHERIN's laptop, and discovered multiple folders containing child pornography, including approximately 421 videos depicting children engaged in sexually explicit activity. The majority of these child pornography files were found in a folder identified as "MEGAsync Downloads." There were two subfolders found in the MEGAsync Downloads folder, which were titled "great" and "MP4". Within the "great" folder, there are approximately 95 videos of child pornography. One such video depicted a small child, approximately, three to four years old, digitally and orally stimulating the breast and vagina of an adult female. Later in the same video, the adult female digitally and orally stimulated the young three to four year old's vagina. This particular video was approximately 39 minutes long. Another video in the "great" folder depicted two young female children and one adult male. The young female children appeared to be approximately eight to ten years old. The adult male coerced one of the young female children to orally simulate the other child's vagina while the adult male placed his penis in one of the children's mouth.

38. Within the "MP4" folder, your affiant identified approximately 297 videos depicting child pornography. One such video, titled, "!!!New!!! (Pthc) Nina 2 (7 Yo Bj) AND 7yo_suck_2", depicted a young female child, approximately seven to eight years old lying naked on a bed. An adult male directed the child to lay straight and then filmed her entire body. The adult male then straddled the young child's chest and inserted his penis into the young girl's mouth, then intermittently removed his penis and masturbating. The video ended with the adult male sliding his penis down to the young female child's vagina.

39. SUTHERIN's computer was also found to contain a "Document" folder containing additional child pornography. One video was a video titled "New_Amber – 7Yr Old Pedo-Preteen-Bondage_Selective…" This video depicted a young child, approximately seven years old, nude and bent over with her hands tied to her ankles. The hand of an adult, gender unknown, entered the screen and fondled the child's anus.

40. Within SUTHERIN's "Downloads" folder there was yet another subfolder titled

10

"yg2." This folder contained approximately 22 child pornography videos. Also within SUTHERIN's "Downloads" folder was a video titled "make daddy cum 12yo". The video depicted a naked female child, approximately 12 years old, who was orally and digitally masturbating an adult male's penis until the adult male ejaculated on the female child's face. Upon further review of the "Downloads" folder within SUTHERIN's computer, your affiant discovered four additional videos depicting child pornography, as well a folder titled "Preview", which contained 14 thumbnail images from child pornography videos.

41. SUTHERIN's iPhone 8 was also forensically examined, and was found to have various applications, including Snapchat, installed. Within the Snapchat account, your affiant observed that the account username was SubTamer69, and had been in communication with a female user, "███████" beginning on July 22, 2018. Within SUTHERIN's SubTamer69 Snapchat account, your affiant observed approximately 80 Snapchat Friends; many of them with female names. Based on the nature of the partial chats that were able to be observed in SUTHERIN's phone, SUTHERIN's admissions that he requested and received child pornography from underage females via Snapchat, and the extent of the child pornography found on SUTHERIN's phone and laptop, your affiant believes that many of SUTHERIN's female Snapchat Friends were likely minors, and that the complete Snapchat communications may reveal them to be victims of SUTHERIN's attempts to sexually exploit them. Of the partial Snapchat conversations recovered from SUTHERIN's phone, the following were identified as potential victims based on the nature of the conversations:

- In a March 5, 2019 Snapchat conversation with SUTHERIN, "███████" sent SUTHERIN a picture of her vagina. SUTHERIN responded to the communication, "Yeah that's right" and "I'm your Daddy now."

- In an April 1, 2019, Snapchat conversation between SUTHERIN and Snapchat user "███████", SUTHERIN sent "███████" an image of a young female's buttocks in short blue jeans shorts, and a separate video of a female child who appeared to be approximately 12 to 14 years old, nude and masturbating. "███████" responded by sending three images of a female in underwear from the waist down, believed by your affiant to be the user of "███████".

- On or about November 21, 2018, SUTHERIN had a Snapchat

11

communication with "▮▮▮▮▮▮▮▮▮▮▮". The following are excerpts from their communication:

- SUTHERIN: You gonna send?
- ▮▮▮ Eh. Don't worry then aha x
- SUTHERIN: If I do it, so do you.
- ▮▮▮ Don't then ahaha.
- SUTHERIN: What?
- ▮▮▮ Don't send. Cuz I won't. And I don't.
- SUTHERIN: What about a compromise?
- ▮▮▮ Ahah
- SUTHERIN: Just audio.
- ▮▮▮ Wdym (what do you mean)
- SUTHERIN: Just audio of you and me.
- ▮▮▮ Oh um na. But I'll text.
- SUTHERIN: you into BDSM/DDLG?
- ▮▮▮ Mmmh. Ours would be more.
- SUTHERIN: What about?
- ▮▮▮ Want to eat me out? Lolol
- SUTHERIN: The pussy or booty?
- ▮▮▮ Pussy bro.
- SUTHERIN: I'm still doing anal.
- ▮▮▮ Yum
- SUTHERIN: What?
- ▮▮▮ U. Yum. Your^'
- SUTHERIN: You sure you wanna see?
- ▮▮▮ Mmh
- SUTHERIN: Hang on. Just don't say I didn't ask.
- ▮▮▮ Ok. Heheh. I would suck it. Fo sure
- SUTHERIN: You want more?
- ▮▮▮ Ye Yum. Aha. Put it in me.
- SUTHERIN: Ass or pussy?
- ▮▮▮ Pussy. Thx.
- SUTHERIN: You ever try anal?
- SUTHERIN: What?
- ▮▮▮ I want you with me.
- SUTHERIN: To do what?
- ▮▮▮ Suck you. Ahah
- SUTHERIN: You sure I can't see anything?
- ▮▮▮ I want you in me now uh.
- SUTHERIN: Anal it is
- ▮▮▮ Ye Put it in.
- SUTHERIN: Can I see it?
- SUTHERIN: Hey.
- SUTHERIN Hey.

- On March 27, 2019, SUTHERIN had a Snapchat conversation with

12

"pocketpotato1" (███ ███. The following are excerpts from their conversations:

- SUTHERIN: Hey
- ███ Hello
- SUTHERIN: you don't mind me adding you on here?
- ███ No not really.
- SUTHERIN: Good
- SUTHERIN: Sorry, I fell asleep.
- ███ It's okay!
- SUTHERIN: Really?
- ███ Yeah hehe
- SUTHERIN: Hey
- ███: Hello
- SUTHERIN: What's up kitty?
- ███ Nothing much I was just trying on some of my new stuff.
- SUTHERIN: Mind if I see?
- ███: Mm I don no
- SUTHERIN: What are you trying on?
- ███ Undies and bras.
- SUTHERIN: I NEED to see this. I'm horny from watching hardcore porn.
- ███ Can I see first?
- SUTHERIN: You sure?
- ███ Yup
- SUTHERIN: Okay. [SUTHERIN sent a picture of his erect penis.]
- ███ hehehehehehe
- ███ No it's okay.
- SUTHERIN: Mind if I see some pics? Can I SS?[4]
- ███ Um
- SUTHERIN: I won't if you don't want me to.
- ███: you can if you want.
- SUTHERIN: Do you personally mind.
- ███ Not really.
- SUTHERIN: You sure?
- ███ Yeah
- SUTHERIN: I just don't wanna be rude.
- ███ It's okay.
- SUTHERIN: Mind if I send more?
- ███ Mmm
- SUTHERIN: I can do pics/vids. I got moaning videos.
- ███ Haha I know. [CHLOE sends video clip of a female pulling up her shirt, showing slight breast development; age is difficult to determine.]
- ███ That's from yesterday
- SUTHERIN: Can I save?

---

[4] Based on the content of the communications, the evidence found on SUTHERIN's phone, and SUTHERIN's admission, your affiant believes that "SS" means Screen Shot, meaning that SUTHERIN would like to take a screen capture of the pictures he wanted ███ to send to him.

13

- ▇▇▇: Sure
- SUTHERIN: Hold on. I hope you like this. [SUTHERIN sends an audio clip of him moaning and talking as if he is masturbating.]
- ▇▇▇: Hehehe
- SUTHERIN: That turn you on?
- ▇▇▇: I was already turned on.
- SUTHERIN: This will make you even wetter. [SUTHERIN sends another audio clip of him moaning and screaming as if he is masturbating.]
- ▇▇▇: Hehehe
- SUTHERIN: Well? Make you even wetter?
- ▇▇▇: I don't know.
- SUTHERIN: Really
- ▇▇▇: Yeah
- SUTHERIN: Mind if I see in between your legs?
- ▇▇▇: Nooo
- SUTHERIN: So I can?
- SUTHERIN: You okay?

- On February 9, 2019, SUTHERIN communicated with Snapchat user ▇▇▇, sending ▇▇▇ a video of a female of unknown age inserting a dildo into her anus. In SUTHERIN's comment with the video was, "Sup?" SUTHERIN then sent an image of a small female child, approximately seven to nine years of age. The girl was lying on a bed, looking at the camera, wearing only a black bra and panties. She has tape across her mouth and her legs were bound with red rope and were raised up to her chest. Her arms were bound with red rope behind her back. SUTHERIN then sent ▇▇▇ a video of a young female, believed to be under the age of eighteen in the shower with her breasts and vagina exposed. ▇▇▇ replied, sending SUTHERIN two images of a female, approximately eight to nine years old, with her breasts and vagina exposed. SUTHERIN responded with two separate images. One image was of a young female child approximately 12 years old, masturbating and expectorating fluid from her vagina. The second video SUTHERIN sent was of a young Asian female child, between approximately nine years old to eleven years old, her vagina and breasts exposed, her legs spread apart and masturbating.

42. In addition to the evidence regarding SUTHERIN's Snapchat communications, the KIK account installed on and accessible from his phone also revealed chats in which he traded child pornography files and/or links. There were also several screen captures of chats from unknown applications that appear to be between SUTHERIN and young females. Although

14

most of the screen captures did not contain information showing what application was being used or the user name of both persons engaging in the chat conversation, your affiant believes these screen captures were of conversations SUTHERIN engaged in, based on one such screen capture with a user identified as ▇▇▇▇▇▇ in which the other user, believed to be SUTHERIN, informs ▇▇▇▇▇▇ that his SnapChat account user name is SubTamer69. In at least one of these screenshot conversations, SUTHERIN requested that the other user, "▇▇▇▇▇▇," send him a "stripping video." "▇▇▇▇▇▇" sent SUTHERIN a video, but your affiant was not able to access the video, due to the conversation being a screenshot. However, your affiant did observe more than 100 videos on SUTHERIN's phone that depicted young female children stripping nude. In addition to these videos, agents have identified approximately 3,000 images on SUTHERIN's phone that either depicted child pornography or screen captures of chats about child pornography or child sexual exploitation.

43. Based on all of the foregoing, your affiant believes there is probable cause that the SUBJECT ACCOUNT contains evidence that SUTHERIN has not only received and possessed child pornography, but that he has also solicited child pornography from both other adult child sexual predators and children he has communicated with via Snapchat. Your affiant further believes SUTHERIN's admissions that he used Snapchat and Instagram to coerce young female children to send him elicit videos, as well as some of the aforementioned excerpted Snapchat communications discovered on SUTHERIN's phone, establishes that there is probable cause that there is additional evidence within the SUBJECT ACCOUNT of SUTHERIN's elicit activities.

## VI. COMMON CHARACTERISTICS OF INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN

44. Based on my own knowledge, experience, and training in child exploitation and child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in communicating about and engaging in sexual abuse of children and receiving, distributing or collecting child pornography:

A. Those who communicate about and engage in sexual abuse of children and exchange or collect child pornography may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person,

15

in photographs, or other visual media; or from literature and communications about such activity.

B. Those who communicate about and engage in sexual abuse of children and trade or collect child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, video tapes, books, slides and/or drawings or other visual media, including digital files. Child pornography collectors oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

C. Those who communicate about and engage in sexual abuse of children and trade or collect child pornography sometimes maintain any "hard copies" of child pornographic material that may exist that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. These child pornography collections and communications are often maintained for several years and are kept close by, usually at the collector's residence. In some recent cases, however, some people who have a sexual interest in children have been found to download, view, then delete child pornography on a cyclical and repetitive basis, and to regularly delete any communications about the sexual abuse of children rather than storing such evidence on their computers or digital devices. Traces of such activity can often be found on such people's computers or digital devices, for months or even years after any downloaded files have been deleted.

D. Those who communicate about and engage in sexual abuse of children and trade or collect child pornography also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

E. When images and videos of child pornography or communications about sexual abuse of children are stored on computers and related digital media, forensic evidence of the downloading, saving, and storage of such evidence may remain on the computers or digital media for months or even years even after such images and videos have been deleted from the computers or digital media.

45. In light of the admissions SUTHERIN made to agents, detailing how he downloaded videos and images of child pornography from other child sexual predators, how he asked young girls to perform illicit sexual acts via social media, and how he then recorded and stored this illicit material onto his phone and laptop, as well as agents' observations of child pornography while examining SUTHERIN's Apple I-Phone 8, your affiant believes SUTHERIN has been enticing young children to provide him child pornography and has been exchanging child pornography with other child sexual predators via, among other platforms, the SUBJECT ACCOUNT. Based upon the conduct of individuals involved in sexually abusing children and/or trafficking in child pornography set forth in the above paragraphs, namely, that they tend to maintain their collections at a secure, private location for long periods of time, and that forensic evidence of the downloading, saving, and storage of such evidence may remain on the computers or digital media for months or even years after such evidence has been deleted from the computers or digital media, there is probable cause that evidence of the offenses of receiving, distributing and possessing child pornography, and coercion or enticement of a minor is currently located on the SUBJECT ACCOUNT.

## VII. CONCLUSION

46. Based on the forgoing factual information, your affiant submits there is probable cause to believe that violations of 18 U.S.C. §§ 2251, 2252, 2252A and 2422(b) have been committed, and evidence of those violations is located in the content of the SUBJECT ACCOUNT. Your affiant respectfully requests that the Court issue a search warrant authorizing the search of the SUBJECT ACCOUNT described in Attachment A, and the seizure of the items described in Attachment B.

Michael A. Harey
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this 12th day of June, 2019.

Elizabeth A. Preston Deavers
United States Magistrate Judge
United States District Court, Southern District of Ohio